IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JACOB LEHMKUHL,

    **Plaintiff,**

v.                                                    CASE NO.  23-3107-JWL

JEFF EASTER, Sedgwick County
Sheriff,

    **Defendant.**

## MEMORANDUM AND ORDER

Plaintiff brings this pro se civil rights action under 42 U.S.C. § 1983.  Plaintiff is in custody at the Sedgwick County Jail in Wichita, Kansas ("SCJ" or "SCADF").  The Court granted Plaintiff leave to proceed in forma pauperis.  On May 23, 2023, the Court entered a Memorandum and Order to Show Cause (Doc. 8) ("MOSC") finding that the proper processing of Plaintiff's Eighth Amendment claims cannot be achieved without additional information from appropriate officials of the SCJ.  *See Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978); *see also Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991).  Accordingly, the Court ordered the appropriate officials of the SCJ to prepare and file a *Martinez* Report regarding Plaintiff's Eighth Amendment claim.[1]

The *Martinez* Report (Doc. 14) (the "Report") has now been filed.  The Court's MOSC provided that "[o]nce the report has been received, the Court can properly screen Plaintiff's claims under 28 U.S.C. § 1915A."  (Doc. 8, at 6.)  The Court's screening standards are set forth in detail in the MOSC.

## I. Nature of the Matter before the Court

Plaintiff alleges that on September 20 or 21, 2022, Defendant Jeff Easter sexually

---

[1] Plaintiff's other claims have been dismissed.  *See* Doc. 20 (Memorandum and Order dismissing Plaintiff's claims under K.S.A. 21-5416 and K.S.A. 21-5505).

assaulted Plaintiff at the SCJ, by groping Plaintiff while he was in restraints, spreading Plaintiff's "butt cheeks," and then pinning Plaintiff against the desk. (Doc. 7, at 3; Doc. 7–1, at 1.)

Plaintiff also alleges that he was forced to stay in unhealthy living conditions for ten days. (Doc. 7, at 3.) Plaintiff claims that around November 17, 2022, he was forced to stay in an area with so much feces on the walls that feces came out of his nostrils the next day when he blew his nose. *Id*. at 4; Doc. 7–1, at 1. Plaintiff alleges that his cell walls, the food pass, the camera, and the vents, were covered in feces, and there was bug larvae everywhere. (Doc. 7–1, at 1.) Plaintiff also claims that the cold water "barely drizzled." *Id*. Plaintiff alleges that his requests to move or have his cell cleaned were refused. *Id*. at 2.

## II. The Report

The Report provides that:

> 1. Jacob Allen Lehmkuhl was booked into SCADF on September 14, 2022 at 2:40 AM. See Attachment 3 (Page 1).
> 2. On or about September 18, 2022, Plaintiff was moved from detention cells to the Clinic at SCADF, in order to address his complaints about his cell being too loud and anxiety issues. *Id*. at 2-3. The inmate was placed on numerous restrictions at that time, until "cleared by mental health," including no access to a razor, mandatory cell shakedown each shift, no out-of-cell exercise, no books, and no computer tablet. *Id*.
> 3. On October 4, 2022, Plaintiff refused to shower, and reported to SCADF staff that he has a device implanted in his head. *Id*. at 6. On October 8, 2022, Plaintiff was overheard by SCADF staff discussing his ability, though not necessarily intention, to attack the guards and stage a riot. *Id*. at 8. On October 9, 2022, Plaintiff engaged in demeaning and threatening behavior toward SCADF staff. *Id*. at 9.
> 4. On November 10, 2022, Plaintiff reported "hearing radio frequencies in his head" and demanded to be transferred within SCADF. *Id*. at 16. Plaintiff was moved on November 11, 2022. *Id*. at 18. On November 17, 2022, Plaintiff was transferred within SCADF from Detention cells to Booking cells, and ultimately to a new Detention cell location. *Id*. at 19. It is important to note that regarding the cell transfers on November 17, 2022, there are no recorded complaints regarding cell conditions in the Inmate Log,

and contemporaneous kites from November 18, 2022 relate to meetings with legal representation, and devices implanted in his body. *Id.*; Attachment 5.

5. On November 21, 2022, Plaintiff filed a large number of complaints alleging that "there is poop all over my cell." Attachment 5. Plaintiff was removed from his cell that day at 3:18 PM in order to determine the status of his cell and clean it; eventually Plaintiff was taken to the Clinic, and not returned to his cell until 7:14 PM. Attachment 3 at 20.

6. In addition to the above, Plaintiff was transferred on at least four occasions to new cells within the facility between November 28 and December 1, 2022. *Id*. at 21.

7. On December 24 and 26, 2022, Plaintiff renewed complaints about the radio frequencies he was hearing, apparently via some implant. *Id*. at 24. He was also moved to another housing location, in order to observe him more carefully in light of his mental state. *Id*.

8. On January 5, 2023, Plaintiff was observed smearing his own feces on the video visit phones in Pod 17, and was restricted from use of the phones and video kiosks. *Id*. at 27. Plaintiff was disciplined for smearing his own feces on the video kiosks. Attachment 4.

9. On January 7 and 8, 2023, immediately following the incident with the video kiosks, Plaintiff then renewed his complaints that his cell was covered in feces, and he was transferred to yet another cell on that same day. Attachment 3 at 29-30.

10. On January 13, 2023, Plaintiff again complained of RFID chips in his head, and accused others of smearing feces on the visitation phones. *Id*. at 31. He was placed back on mental health watch. *Id*.

11. On February 19. 2023, after months of unsuccessfully attempting to obtain a computer tablet, which was prohibited by Plaintiff's mental health restrictions, Plaintiff was caught with another inmate's misappropriated tablet. This followed Plaintiff's menacing of a detention deputy on the previous day. *Id*. at 40.

12. Plaintiff reported hearing voices on March 8, 2023, including what sounded like a "woman moaning and having sex" as well as black men threatening him through the vent in his cell. *Id*. at 44. On March 10, 2023, Plaintiff claimed that he had surgery on his anus, requiring a new blanket, due to blood everywhere in his cell. *Id*. On that same date, Plaintiff made inappropriate statements and gestures to a nurse, and again complained of radio signals from the chip in his head. *Id*. at 44-45.

13. Since his incarceration, Plaintiff has filed nearly 170 "kites," or communications with Detention personnel with requests, complaints, and other communications. **Attachment 5** attempts to provide a representative sample of the complaints, generally

>relating to Plaintiff's ongoing complaints about feces, which appears to follow him from cell-to-cell within the facility, and his allegations that he has been sexually assaulted by deputies, inmates, and others, via the use of the RFID chip implanted in his brain. This Reporting Defendant can provide the balance of the kites upon request. Of note, while kites of this type begin in November of 2022 and continue through June 23, 2023 when the kites were pulled for examination for this report, Plaintiff makes a variety of accusations against a great many people, Sheriff Jeff Easter is not mentioned in these oft-repeated allegations.
>14. Regarding the allegations of misconduct and sexual assault on Plaintiff, ostensibly committed by Sheriff Easter, same were investigated by the PREA Coordinator at SCADF. Witnesses were interviewed and facility video was scrutinized to determine the veracity of the accusations. Attachment 1 constitutes the written record of the PREA investigation, and Attachment 2 is the video of the purported "assault."

(Doc. 14, at 2–5.)

## III. Discussion

Plaintiff alleges that Sheriff Easter sexually assaulted Plaintiff at the SCJ, by groping Plaintiff while he was in restraints, spreading Plaintiff's "butt cheeks," and then pinning Plaintiff against the desk. (Doc. 7, at 3; Doc. 7–1, at 1.) The video shows the Sheriff arriving at the door to meet Plaintiff. (Doc. 16, video filed conventionally.) The Sheriff then places handcuffs on Plaintiff and when Plaintiff starts walking away from the Sheriff a struggle ensues. *Id*. The Sheriff then grabs Plaintiff and pushes him to the wall, struggling to gain control. *Id*. Although part of the struggle is obscured from view, nothing in the video suggests Plaintiff was sexually assaulted. *Id*. Plaintiff was not pinned to the desk as alleged in his Complaint, and backup officers arrived on the scene within approximately 48 seconds. *Id*.

The PREA investigation of the incident states that Plaintiff claimed that the assault occurred during a search, and Plaintiff refused two separate times to speak with the investigator. (Doc. 14–1, at 2.) The investigator determined that Plaintiff's complaints were unfounded. *Id*.

4

at 1. The Report states that an examination of Plaintiff's history during his tenure in the SCADF indicates his belief that the RFID chip allegedly implanted in his head provides the means and method by which others purportedly sexually assaulted him. (Doc. 14, at 5; *see also* Doc. 14–4.)

In one instance, Plaintiff claimed that staff were using "voice recognition synthesizer systems" and "nano technology" to sexually assault him and to place images over his eyes to keep him awake. (Doc. 14–4, at 6.) Plaintiff alleges that this was happening through the vent in his cell. *Id*. at 7. In another grievance, Plaintiff claims staff used nano technology, radio frequencies, and speakers in the vents of his cell to wake him up every morning at 3 a.m. to sexually assault him. *Id*. at 8. Plaintiff claims that about 35 deputies are involved in torturing and sexually assaulting him, and other inmates are being paid in "bit coin etc" to keep the secret. *Id*. at 10. In another grievance, Plaintiff claims that people are harassing him "through the tv case display p2p system audio" and that they are "playing audios through the TV" to harass him. *Id*. at 12, *see also id.* at 13–17, 33 (similar claims). A response to one of his grievances states that:

> Spoke with mental health staff and Detective Maness. Inmate has made these claims since arriving at the facility. Mental health staff has stated these are delusional claims. Camera footage was checked and nothing could ever be found with his claims. He insists "nano-technology" is being used to rape him and not any person specifically touching him.

*Id*. at 15. Plaintiff also claims that they are putting nano technology in his food and pills to "later cause different stimulation to different parts of my body as a way to torture me and rape me." *Id*. at 25.

Plaintiff also alleges that he was forced to stay in unhealthy living conditions, claiming his cell was covered in feces and his requests to move or to have his cell cleaned were refused. (Doc. 7, at 3–4; Doc. 7–1, at 1–3.) The Report states that Plaintiff's complaints regarding his

5

living conditions were investigated, found to be unsubstantiated, and were not supported by any similar claims by other inmates. (Doc. 14, at 6.) Regardless, Plaintiff's was moved to a different cell multiple times. He also received an Incident Report for placing fecal matter on the video visitation machines on January 7, 2023. (Doc. 14–3.) Although he claims he was never moved to a different cell, his grievance states that he was moved to a cell with feces "all over the place" at 5:22 p.m. on January 7, 2023, and was moved on January 8, 2023, at around 10:31 p.m. (Doc. 14–4, at 22.) The response to this grievance states that "[t]here is a record of the cell being checked before you were moved into it." *Id*. In other grievances regarding his living conditions, he states that "they foam sprayed the cell but not thoroughly enough to maintain a healthy sanitary living condition/environment." *Id*. at 35.

The Tenth Circuit has held that a pretrial detainee's claims regarding conditions of confinement are governed by the Due Process Clause, and that "the Eighth Amendment standard provides the benchmark for such claims." *Routt v. Howard*, 764 F. App'x 762, 770 (10th Cir. 2019) (unpublished) (quoting *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998)); *see also Hooks v. Atoki*, 983 F.3d 1193, 1203–04 10th Cir. 2020) (declining to extend *Kingsley's* exclusively objective standard for pretrial detainees' excessive force claims to Fourteenth Amendment deliberate indifference claims).

The Eighth Amendment requires prison and jail officials to provide humane conditions of confinement guided by "contemporary standards of decency." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). "Under the Eighth Amendment, (prison) officials must provide humane conditions of confinement by ensuring inmates receive the basic necessities of adequate food, clothing, shelter, and medical care and by taking reasonable measures to guarantee the inmates' safety." *McBride v. Deer*, 240 F.3d 1287, 1291 (10th Cir. 2001) (citation omitted).

A prison official violates the Eighth Amendment when two requirements are met. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "First, the deprivation alleged must be, objectively, 'sufficiently serious.'" *Id*. To satisfy the objective component, a prisoner must allege facts showing he or she is "incarcerated under conditions posing a substantial risk of serious harm." *Id.*; *Martinez v. Garden*, 430 F.3d 1302, 1304 (10th Cir. 2005).

The second requirement for an Eighth Amendment violation "follows from the principle that 'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.'" *Farmer*, 511 U.S. at 834. Prison officials must have a "sufficiently culpable state of mind," and in prison-conditions cases that state of mind is "deliberate indifference" to inmate health or safety. *Id*. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837. "The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'" *Id*. It is not enough to establish that the official should have known of the risk of harm. *Id*.

Plaintiff has not shown that he is incarcerated under conditions posing a substantial risk of serious harm, and he has not shown that defendant was deliberately indifferent to his health or safety. Plaintiff will be given an opportunity to respond to the Report and to present conflicting evidence.

**IV.  Response Required**

The *Martinez* report developed as a means "to ascertain whether there is a factual as well as a legal basis for [a] prisoner's claims." *Gee v. Estes*, 829 F.2d 1005, 1007 (10th Cir. 1987). The report "is treated like an affidavit, and the court is not authorized to accept the factual findings of the prison investigation when the plaintiff has presented conflicting evidence." *Hall*

7

*v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) (citing *Sampley v. Ruettgers*, 704 F.2d 491, 493 n. 3 (10th Cir. 1983)). Thus, at this point in the proceedings the Court does not use the Report to resolve conflicts of fact. *See Swoboda v. Duback*, 992 F.2d 286, 290 (10th Cir. 1993) ("In determining whether a plaintiff has stated a claim, the district court may not look to the Martinez report, or any other pleading outside the complaint itself, to refute facts specifically pled by a plaintiff, or to resolve factual disputes."). In light of the Report, the Court is considering dismissal of this matter for failure to state a claim. Plaintiff will be given an opportunity to respond to the Report and to show good cause why dismissal should not be entered. Failure to respond by the Court's deadline may result in dismissal of this action without further notice.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff is granted until **September 1, 2023,** in which to respond to the Report and to show good cause, in writing to the undersigned, why Plaintiff's remaining Eighth Amendment claims should not be dismissed for failure to state a claim.

**IT IS SO ORDERED.**

Dated August 3, 2023, in Kansas City, Kansas.

<u>S/ John W. Lungstrum</u>
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**